CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ADITHYA MANI (Bar No. 301880)
(E-Mail: Adithya_Mani@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
TONY TYRON LEE STEWART

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>TONY TYRON LEE STEWART,<br><br>    Defendant. | Case No. 22-CR-028-JAK-1<br><br>**DEFENDANT STEWART'S SENTENCING POSITION; EXHIBITS** |

Defendant Tony Tyron Lee Stewart, by and through his attorney of record, Deputy Federal Public Defender Adithya Mani, hereby files his sentencing position, which is based on the attached memorandum of points and authorities and exhibits.

                                          Respectfully submitted,

                                          CUAUHTEMOC ORTEGA
                                          Federal Public Defender

DATED: September 22, 2022      By  */s/ Adithya Mani*
                                          ADITHYA MANI
                                          Deputy Federal Public Defender
                                          Attorney for TONY TYRON LEE STEWART

# MEMORANDUM OF POINTS AND AUTHORITIES

## A. Introduction

> Walking home from school one day, I stopped in a grocery store, never stealing anything in my life before. I stole from the store with my friends after feeling too embarrassed to tell my friends I was really hungry and haven't ate[sic] at home. I know my friends were doing it to look cool. Later on, starting to run out of Stater Bros with meals and leaving malls with better clothes trying to survive, is what led me to this route.
>
> But I have no one to blame but myself seeing an easy way and going for it, not realizing I am hurting others in the process. I truly apologize, but words aren't enough [.]

Exh. A, Tony Stewart Letter ("T. Stewart Letter), at 1.[1]

Around the year 2000, Mr. Stewart's biological father, Ronald, tried to break up a fight. He died in the cross-fire that ensued. Mr. Stewart was only a year old at the time and remembers nothing about Ronald.

When Mr. Stewart was approximately 6 years old, his mother met and dated a caring man named Darcell. Darcell was like a father to Mr. Stewart. Around 2 years later, Darcell also died from gun violence. Darcell is the father that Mr. Stewart remembers losing.

Around 6 years later, Mr. Stewart's elder brother, Jason Taylor, also died from gun violence. By the time he was 15, Mr. Stewart had lost his three closest elder male figures to gun violence.

---

[1] Counsel transcribed a handwritten version of Mr. Stewart's letter that he sent to Mr. Stewart to sign. Mr. Stewart attempted to sign and return this typed letter, but it was never received by undersigned counsel's office. To avoid delaying proceedings, Mr. Stewart requests the Court to consider the typed version of his letter that the defense has submitted, even though the defense was not able to provide the Court with a copy of a signed version.

Compounding his tragic childhood, Mr. Stewart never received any counseling or therapy to process all of the gun violence he experienced, nor to process all of the physical abuse he suffered.

Now, after realizing that his poor decision-making has flowed from his untreated trauma, Mr. Stewart has admitted that he needs help. Mr. Stewart writes that,

> To learn more about my mistakes and figure out ways to avoid them in the future, I have requested to be in every class here. I ask for classes to further my education as well as therapy and drug classes. Since I have been incarcerated, I have been reading and praying. I have also been doing a lot of thinking. This is not what God has in store for me. This is not what my family wants for me. This is not what I want for myself. This is not my destination.

(Exh. A, T. Stewart Letter.)

Taking into account all of the sentencing factors under 18 U.S.C. § 3553, as outlined in *United States v. Booker*, 543 U.S. 220 (2005), the defense respectfully contends that a sentence of 48 months in custody and 3 years of supervised release is sufficient but no greater than necessary to achieve the goals of sentencing.

**B.   Procedural Posture**

On June 9, 2022, Mr. Stewart pled guilty, pursuant to a plea agreement, to Count 1 of the Indictment, charging him with Conspiracy to Interfere with commerce by Robbery, in violation of 18 U.S.C. § 1951(a). (Minutes of Change of Plea Hearing, Dkt. 82.)

On February 22, 2022, the United States Probation & Pretrial Services Office ("USPO") disclosed the Presentence Investigation Report ("PSR") and its recommendation. The PSR calculates an advisory guidelines range of 87 to 108 months, based on a total offense level of 27 and a Criminal History Category of III, which the government agrees with. (PSR, Dkt. 92, at 3; Gov. Sent. Mem., Dkt. 99.) The USPO recommends a below-guidelines sentence of 60 months, partially due to Mr.

Stewart's "lack of youthful guidance, the deaths of immediate family members, and his struggle with undiagnosed PTSD, depression, and anxiety." (*Id.*, ¶ 186; USPO Recommendation, Dkt. 91, at 2.)

### 1.  Personal History and Characteristics

#### a.  Mr. Stewart's Father Dies While Mr. Stewart is an Infant

Mr. Stewart was born on July 8, 2000 to Ronald Stewart and Jessica Vallier. (PSR, ¶ 126.) Unfortunately, when Mr. Stewart was just a year old, Ronald died in firearm cross-fire while trying to break up a fight. (*Id.*) Because Ronald died when Mr. Stewart was just an infant, Mr. Stewart has no memories of his father. (*Id.*)



Mr. Stewart (right) as an infant, with his mother and sister

During his childhood, Mr. Stewart felt alone: his elder siblings were usually focused on their own lives and his mother worked long hours to support the family. (PSR, ¶ 129; Exh. A, T. Stewart Letter, at 1.) Unfortunately, when Mr. Stewart's siblings focused on him, it was to pick on him and physically abuse him. For example, when Mr. Stewart was between the ages of 5 to 7, one of his brothers beat Mr. Stewart up so badly that he suffered broken collarbones and wrists. (PSR, ¶ 143.) Mr. Stewart's childhood physical abuse was so bad that he still suffers from severe headaches that occasionally cause him to have double vision or vomit. (*Id.*, ¶ 144.)

Because of how his siblings treated him, Mr. Stewart always felt closest to his mother, especially since he had no father figure. (PSR, ¶ 129-31.) Even now, one of Mr. Stewart's biggest regrets in committing the instant offense is that he cannot yet pay his mother back for all she has done for him and his family. (Exh. A, T Stewart Letter, at 1.)

With the encouragement of his mother, Mr. Stewart played basketball and football while growing up. (PSR, ¶ 131.) Because his family had little money, Mr. Stewart had to sell candy to pay for his sports registration fees. (*Id.*) Also because of his family's poverty, Mr. Stewart went to 5 different elementary schools and often got into trouble because of how difficult it was to handle the transition of moving into a new school each time. (*Id.*)

      **b.**    **Ms. Vallier's Partner Serves as a Role Model Until his Death**

Elementary school, however, was not all bad for Mr. Stewart. When Mr. Stewart was approximately 6 years old, Ms. Vallier was in a stable relationship with a man named Darcell, who served as a role model to Mr. Stewart. (PSR, ¶ 132.) Darcell kept Mr. Stewart on track, ensuring that he was putting his full effort into school and becoming interested in subjects like history and science. (*Id.*) Unfortunately, Darcell passed away from gun violence when Mr. Stewart was around 8 years old. (*Id.*, ¶ 133.) Mr. Stewart was heartbroken because he felt like he lost his own father. (*Id.*)

After Darcell's death, Ms. Vallier was always at work to financially support the family. (PSR, ¶ 134.) Mr. Stewart was left to try to process the trauma of losing his role model with minimal guidance. (*Id.*) Mr. Stewart again started struggling in school after losing his focus as a result of Darcell's death. (*Id.*)

      **c.**    **Mr. Stewart's Traumas Trigger a Downward Spiral Starting in High School**

As Mr. Stewart grew older, he became closer with his brother, Jason Taylor, and his sister, Sarena Vallier. (PSR, ¶ 135.) Tragically, when Mr. Stewart was around 14 years old, Jason also died from gun violence, just like Mr. Stewart's biological father

and Darcell. (*Id.*) Making matters worse, Sarena started abusing drugs and lashing out at Tony as a result of Mr. Taylor's death. (*Id.*) Again, Mr. Stewart did not undergo any therapy or counseling to process the trauma of losing another close family member to violence. (*See* PSR, ¶ 147.) The closest thing to formal counseling that Mr. Stewart has ever had was a group session in middle school where the members discussed wanting better lives. (*Id.*) That was it.

Mr. Stewart's unaddressed and untreated trauma from experiencing childhood poverty and losing his loved ones to violence manifested into a downward spiral starting in high school. He started a daily habit of smoking marijuana and abusing prescription cough syrup with codeine. (PSR, ¶¶ 152, 154.) Mr. Stewart also started abusing other prescription pills almost every day to numb his pain and ease his anxiety when thinking about his prior traumas. (*Id.*, ¶ 155.)

During his junior year of high school, Mr. Stewart decided he wanted to help his mother take care of their impoverished family. (PSR, ¶¶ 34, 136, 159.) So Mr. Stewart dropped out, and started working as a caretaker with Janet Care to help his

///

6

impoverished family. (*Id.*, ¶¶ 34, 136.) Mr. Stewart's mother was not happy about his decision, as she aspired for him to finish school. (*Id.*, ¶ 136.) But Mr. Stewart felt proud of trying to help his family financially. (*Id.*)



Mr. Stewart (left) working with clients at Janet Care

Mr. Stewart enjoyed working as a caretaker for some time, but was terminated after showing up to work late one day after he tried to start taking classes at the same time. (PSR, ¶¶ 34, 163.) Since then, Mr. Stewart has been unable to find a steady job. (PSR, ¶ 34.) While looking for work, the boyfriend of Mr. Stewart's sister died from an overdose at their house, while Mr. Stewart and his mother tried to save him. (*See* PSR, ¶ 34.)[2] Within the last couple of years, Ms. Vallier started noticing how depressed Mr. Stewart became from all of the death he has experienced throughout his life. (PSR, ¶ 150.) With no set job, an idle mind, some unsavory associates, and his untreated trauma and likely PTSD from experiencing so much unexpected death, Mr. Stewart made the poor decision to commit the instant offense. (*Id.*, ¶ 34.)

---

[2] The PSR notes that the victim of the overdose was Mr. Stewart's sister, and not her boyfriend. After discussions with the USPO, undersigned counsel anticipates that this fact will be corrected in the revised presentence report.

7

### 2. Deterrence: Mr. Stewart's Reflections and Maturity While Serving his Longest Sentence Will Deter him From any Future Crime

Even a one-year sentence would be longer than Mr. Stewart's sole prior sentence. (PSR, ¶ 109 (showing one conviction, with a sentence of 270 days jail and 2 years of probation).) Thus, even a below-guidelines sentence would sufficiently punish and deter Mr. Stewart from any future crimes.

In addition, Mr. Stewart has also already started making strides in realizing what he needs to do to avoid any problems in the future. He has finally acknowledged that he needs mental health treatment after trying to deny that he had any issues before, due to a fear of appearing weak. (*See* PSR, ¶ 148.) Now, Mr. Stewart knows it is a sign of strength to be vulnerable and to ask for help.

Mr. Stewart also has admitted to himself that substance abuse treatment can help him learn how to better cope with his prior traumas, explaining that "[t]o learn more about my mistakes and figure out ways to avoid them in the future, I have requested to be in every class here. I ask for classes to further my education as well as therapy and drug classes." (Exh. A, T. Stewart Letter, at 1.)

Going forward, Mr. Stewart plans to make the most of any sentence the Court imposes by taking advantage of every rehabilitative program available to him. He has felt terrible that he has ended up with a federal felony after how hard his mom worked to keep him out of this situation. Despite facing a long sentence, Mr. Stewart is hopeful for his future, stating that "[w]hen I complete my sentence, I plan to give back. Better things with my family, be a better person, go to church and find a stable job." (Exh. A, T. Stewart Letter, at 2.)

///



Mr. Stewart with his partner, Jasmine Casados

## C. Conclusion

For the foregoing reasons, the defense respectfully requests the Court sentence Mr. Stewart to 48 months in custody and 3 years of supervised release.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 22, 2022          By  /s/ *Adithya Mani*
ADITHYA MANI
Deputy Federal Public Defender
Attorney for TONY TYRON LEE STEWART